**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**DAVID S. JONES,**

      **Plaintiff,**

**v.**                                                      **Case No.: 3:11-cv-00257**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 10 and 11).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned recommends that the Commissioner's motion be granted, that plaintiff's motion be denied, and that this

case be dismissed, with prejudice, and removed from the docket of the Court.

## I.   **Procedural History**

Plaintiff, David Jones (hereinafter "Claimant"), filed applications for SSI and DIB on April 30, 2009 (Tr. at 122–23, 124–27), alleging a disability onset date of January 1, 2003 due to bilateral carpal tunnel syndrome, status post fracture of the left ankle, arthritis in back and neck, status post fracture of neck, ruptured disc in back, nerves and depression.[1] (Tr. at 153, 190). The Social Security Administration (hereinafter "SSA") denied Claimant's applications on November 12, 2009. (Tr. at 62–66, 67–71). Claimant filed a request for reconsideration, which was also denied. (Tr. at 76–81). Claimant then requested a hearing in front of an Administrative Law Judge (hereinafter "ALJ"), which was held before the Honorable Caroline H. Beers, ALJ, on August 10, 2010. (Tr. at 23–49). By written decision dated August 31, 2010, the ALJ denied Claimant's SSI and DIB claims. (Tr. at 7–22). The ALJ's decision became the final decision of the Commissioner on February 18, 2011 when the Appeals Council denied Claimant's request for review. (Tr. at 1–3). Claimant timely filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. §405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties filed their Briefs in Support of Judgment on the Pleadings. (ECF Nos. 8–11). Consequently, the matter is ripe for resolution.

## II.   **Relevant Evidence**

Claimant was 46 years old at the time of the amended date of disability onset.

---

[1] At the administrative hearing, Claimant amended his onset date to July 1, 2007. (Tr. at 27–28).

2

He had a high school education, was fluent in English, and worked in the past as a director of security at a local hospital, a barge laborer, and a construction supervisor doing interior renovations. Claimant supplied medical records detailing treatment he received beginning in August 2002 and continuing through November 2009. The undersigned has reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute.

### A.    Treatment Records

1.    *Prior to Amended Disability Onset Date*

On August 12, 2002, Claimant was examined by Earl Foster, MD, complaining of a work-related injury to his left index finger and left middle finger. (Tr. at 246–47). Claimant worked at Prestera Centers for Mental Health performing maintenance and was injured when a garage door spring broke and hit him in the hand. (Tr. at 246). Dr. Foster found that Claimant's distal joint was tender but that Claimant exhibited full extension of both fingers with no neurological deficits. (*Id.*). X-rays revealed a fracture at the distal phalanx of both fingers. (*Id.*). Dr. Foster diagnosed Claimant with a mallet left middle finger and a distal phalanx fracture of the left index finger and applied a stack splint to both fingers. (Tr. at 247). At a follow-up appointment on August 26, 2002, Claimant complained to Dr. Foster of mild discomfort in the proximal forearm. (Tr. at 245). X-rays revealed no abnormalities of Claimant's elbow or forearm. (*Id.*). Dr. Foster estimated that Claimant could return to work in five weeks and scheduled an appointment to re-examine Claimant prior to releasing him to work. (*Id.*).

3

Claimant returned to Dr. Foster's office on September 30, 2002. (Tr. at 244). Dr. Foster found that Claimant still experienced a 20-degree extension lag at the distal joint of the middle finger, resulting in decreased range of motion. (*Id.*). Consequently, Dr. Foster recommended physical therapy to prepare Claimant for his return to work scheduled on October 14, 2002. (*Id.*). Claimant also reported pain in his arm, elbow, and neck. (*Id.*). Dr. Foster noted that Claimant had fractured his cervical spine ten years earlier and that the pain Claimant was experiencing in his arms, shoulder, and neck was unrelated to his compensable Workers' Compensation claim. (*Id.*).

On October 15, 2002, Claimant was seen by Jack Steel, MD, following a work-related injury to his ankle after falling down some steps. (Tr. at 243). Dr. Steel concluded that Claimant had sustained a displaced fracture of the distal left fibula, with tenderness about the medial malleolus. (*Id.*). Dr. Steel noted that Claimant could flex and extend his toes without difficulty and that the sensation in his foot remained intact. (*Id.*). Based on the physical examination, Dr. Steel recommended surgery on Claimant's ankle. (*Id.*). On October 21, 2002, Dr. Steel performed an open reduction internal fixation procedure on Claimant's left ankle. (Tr. at 248). Claimant was seen again by Dr. Steel on October 31, 2002, at which time Claimant was fitted for a cast. (Tr. at 242). Dr. Steel noted that Claimant was doing well and that the fracture had been anatomically reduced with screws in a good position. (*Id.*).

On November 4, 2002, Claimant reported to Dr. Foster that he had experienced an event three weeks earlier during which his left side went numb. (Tr. at 241). Claimant described feeling pressure on the top of his head and pain in his cervical spine and shoulder. (*Id.*). However, on examination, Claimant demonstrated

4

a full range of motion with no evidence of muscle weakness. (*Id.*). Dr. Foster expressed concern that Claimant may have suffered a cerebral vascular accident or intermittent orthostatic hypotension and referred him to Family Practice at Marshall University. Dr. Foster also cleared Claimant from an orthopedic standpoint to return to work on November 23, 2002. (*Id.*).

On November 20, 2002, Claimant was seen by Dr. Steel for a follow-up appointment concerning his left ankle injury. (Tr. at 240). Dr. Steel reviewed x-rays and concluded that Claimant's fracture appeared healed. (*Id.*). Dr. Steel outlined an ankle rehabilitation program for Claimant and stated that Claimant could put weight on his ankle as much as he felt he could tolerate. (*Id.*). On January 8, 2003, Claimant reported that he was experiencing significant difficulty walking on stilts hanging dry wall at work. (Tr. at 239). Further, Claimant described having trouble balancing and experiencing pain in his anterior compartments. (*Id.*). Dr. Steel noted that Claimant continued to have muscle weakness and needed to continue his physical rehabilitation. (*Id.*). Dr. Steel wrote a note for Claimant to be off of stilts for the next several weeks. (*Id.*).

On June 30, 2003, Claimant was examined by Robert W. Lowe, MD, at the request of Workers' Compensation. (Tr. at 231–38). Dr. Lowe recorded Claimant's medical history, including a fracture of Claimant's neck in 1991 and surgery on Claimant's left ankle in October 2002. (*Id.*). Regarding his workers compensation claim, Claimant reported that he was injured on July 29, 2002 while performing maintenance at a local business. He was repairing a garage door when the overhead tension spring broke, striking him on the fingers and causing him to fall off a ladder

onto a concrete floor, further injuring his hands, back, and neck.[2] (Tr. at 231).
Claimant described a loss of sensation and decreased range of motion of his left index
finger and a similar decrease in range of motion of his left ring finger. (*Id.*).
According to Claimant, his fingers were determined to be broken at that time, so they
were splinted. He subsequently was released to return to work on light duty. Claimant
indicated that after the fall, he also experienced pain in his left arm, elbow, and
shoulder that was unresolved. Dr. Lowe performed a physical examination, which he
described as "difficult at best," largely because the findings were inconsistent. (*Id.*).
After analyzing Claimant's grip strength, Dr. Lowe stated, "[Claimant's] grip strength
was all over the place and inconsistent, and is similar to the flexion. When asked to
flex he just holds it, but asked to bend the fingers, he makes a rather good fist and
bends the fingers." (*Id.*). Although Claimant reported decreased sensation in his left
finger, Dr. Lowe noted that sensory testing did not indicate any neurological deficit.
(Tr. at 235). Claimant's pinch strength in both hands was normal and he had no
atrophy of the extremities. (Tr. 236). Dr. Lowe found that Claimant's index finger was
slightly impaired but that Claimant could flex and move his middle finger normally.
(Tr. at 237). He documented further that Claimant's neck had normal flexion,
extension, and lateral bending. Dr. Lowe reviewed Claimant's x-rays and concluded
that Claimant's fingers were well-healed with a slight irregularity on the dorsum of
the distal phalanx of Claimant's left middle finger and a slight angulation within the
bone substance of the index finger. (*Id.*). Thereafter, Dr. Lowe reviewed Claimant's
medical records, which included a Workers' Compensation form completed by Dr.

---

[2] Dr. Lowes' letter to Amber Harper at the Workers' Compensation Fund indicates that Claimant's
back and neck injuries were not part of his compensable claim. (Tr. at 231).

Foster on October 15, 2002, stating that Claimant was able to return to full time work and notes prepared by Dr. Matthew Shafer of the Family Practice Center stating that "the patient's finding on history and physical are ambiguous and not attributable to a specific injury as related based on the history and mechanism of [Claimant's fall]." (Tr. at 233). Dr. Lowe recorded his diagnosis of Claimant's injury and opined that Claimant had reached maximum medical improvement. He noted that Claimant was continuing to work performing maintenance and was now self-employed. With respect to Claimant's neck and back claim, Dr. Lowe stated that the relevant records reflected a prior injury and that the records did not include contemporaneous complaints of back and neck pain at the time of Claimant's injury in July 2002. (Tr. at 237–38). Dr. Lowe found that Claimant's grip strength testing and alleged sensory loss were invalid and rated Claimant at 1% impairment of the body as a whole. (Tr. at 238).

On June 1 and 8, 2005, Claimant was examined by Thomas F. Scott, MD, for pain in his left elbow. (Tr. at 229-230). Dr. Scott noted that Claimant exhibited symptoms suggesting epicondylitis of the left elbow, which was not incapacitating, but was recurrent for many years. A physical examination and x-rays revealed no objective abnormalities. Dr. Scott diagnosed Claimant with mild synovitis, prescribed Decadron, and recommended that Claimant use an ace bandage in the evening to help alleviate soreness. On August 12, 2005, Claimant returned to Dr. Scott's office, complaining of persistent left elbow pain. (Tr. at 228). Claimant explained that he was concerned about the pain because it affected his dominant hand and interfered with his ability to hang drywall. Claimant expressed concern that he would no longer be able to work. Dr. Scott injected Claimant's elbow for pain relief and prescribed

Phenobarbital to help Claimant sleep at night.

On December 2, 2005, Claimant again presented to Dr. Scott's office complaining of left elbow pain. (Tr. at 227). Dr. Scott noted that Claimant was not doing well but that he was working more. In addition, Dr. Scott noted that Claimant exhibited signs of arthritis in his metacarpal joints. Dr. Scott reiterated his diagnosis of left epicondylitis and prescribed Phenobarbital. Claimant returned for treatment with Dr. Scott on two occasions in January 2006. (Tr. at 225-226). Claimant explained that he had been working on remodeling a house, which exacerbated his pain. Dr. Scott noted that Claimant was having spasms in his left thumb, applied a splint to Claimant's thumb, and provided Claimant with Celebrex samples. Dr. Scott wrote a prescription for Celebrex to help alleviate Claimant's elbow pain; however, Claimant did not fill the prescription because Celebrex was not on the list of medications approved by Worker's Compensation for reimbursement.

On February 6, 2006, Claimant was seen by Luis Bolano, MD, with complaints of constant thumb and elbow pain when attempting to lift or grip objects. (Tr. at 221–224). Claimant reported that he had been experiencing numbness and tingling for two years in his thumb, index finger, and middle finger. (Tr. at 221). Claimant also complained of his left thumb regularly "locking up" over the previous six months. Dr. Bolano found that Claimant had a full range of motion of all joints in Claimant's upper extremities. (Tr. at 223). Claimant exhibited no visible signs of locking of the middle finger or the thumb. Dr. Bolano noted "a little bit of elbow discomfort" but found that Claimant's elbow had a full range of motion. Cubital tunnel provocative tests were negative. Dr. Bolano diagnosed Claimant with epicondylitis and carpal tunnel syndrome and completed a work slip restricting Claimant to light work for

8

three months. (Tr. at 221).

On March 2, 2007, Claimant was examined by Mary Marcuzzi, MD, at the Family Medical Center at Merritts Creek. (Tr. at 263–65). Claimant complained of having difficulty sleeping and reported a history of high blood pressure, and joint pain. (Tr. at 263–64). Dr. Marcuzzi diagnosed Claimant with insomnia and prescribed Trazodone. (Tr. at 263). Claimant returned for a follow-up appointment with Dr. Marcuzzi on May 21, 2007 and complained of nausea and continuing insomnia. (Tr. at 262). Dr. Marcuzzi noted that the Trazodone did not appear to be working for Claimant.

2.   *Post Amended Disability Onset Date*

On September 19, 2008, Claimant returned for treatment with Dr. Marcuzzi, complaining of lower back pain. (Tr. at 258–59). After examining Claimant, Dr. Marcuzzi noted that Claimant exhibited tenderness in the paraspinal thoracic and lumbar regions. (Tr. at 259). Claimant appeared to ambulate hesitantly and evidenced decreased patella reflexes and flexion. Dr. Marcuzzi diagnosed Claimant with a thoracic and lumbar sprain. Claimant returned for follow-up treatment on January 1, 2009. (Tr. at 256–57). He complained of continuing back pain with pain in his shoulders, knees, and hands. (Tr. at 256). Claimant reported that he continued to work hanging dry wall and remodeling homes. Upon examination, Dr. Marcuzzi noted that Claimant had some difficulty sitting comfortably and continually shifted from side to side. Dr. Marcuzzi diagnosed Claimant with lumbosacral strain and general arthralgia. (Tr. at 257). On March 25, 2009, Claimant reported to Dr. Marcuzzi that his back pain had increased and that he was experiencing stiffness in his joints. (Tr. at 252-53). Claimant reported that he had experienced pain relief from

9

steroids in the past. Dr. Marcuzzi reiterated her diagnosis of chronic lower back pain due to lumbosacral strain and prescribed Flexeril and Lortab for Claimant. (Tr. at 253). She instructed Claimant to rest and recommended that he refrain from lifting at work. On November 11, 2009, Claimant returned for a follow-up appointment with Dr. Marcuzzi. (Tr. at 288–89). Claimant indicated that he was experiencing significant stress and anxiety as a result of the death of his girlfriend.[3] (Tr. at 288). Dr. Marcuzzi opined that Claimant's depression was the result of a grief reaction. (Tr. at 289).

On July 28, 2010, Bruce Guberman, MD, at Tri-State Occupational Medicine, reviewed Claimant's records at the request of Claimant's attorney to provide a written evaluation of his ability to perform basic work activities. Dr. Guberman did not physically examine Claimant, but did have access to the results of an agency arranged evaluation performed by Dr. Kip Beard. Overall, Dr. Guberman found that Claimant had multiple joint symptoms and multiple range of motion abnormalities. (Tr. at 388–89). Dr. Guberman concluded that Claimant's physical impairments severely limited his ability to perform work-related activities. (Tr. at 388–90). Dr. Guberman opined that Claimant had severe limitations in traveling, standing, sitting, walking, bending, stooping, lifting, carrying, pushing, bending, squatting, kneeling, or crawling. (Tr. at 389). Further, Dr. Guberman stated that Claimant had significant limitation in his ability to use his hands and arms for repeated activities, fine manipulation, and pushing and pulling and had difficulty using his lower extremities for repeated activities. Dr. Guberman recommended that Claimant avoid heights,

---

[3] Dr. Marcuzzi's notes indicate that Claimant's "spouse" passed away. Later treatment records make clear that it was actually Claimant's girlfriend who passed away.

vibration, machinery, ladders, and stairs. In conclusion, Dr. Guberman opined that Claimant was permanently and totally disabled. Contemporaneous with his written evaluation, Dr. Guberman completed a residual physical functional capacity evaluation form. (Tr. at 390). Dr. Guberman found that Claimant could occasionally lift ten pounds, frequently lift less than ten pounds, stand or walk about two hours a day, sit for three hours a day, needed to have a 30 minute sit/stand option, and was limited in his ability to push or pull. Claimant's postural limitations restricted him to activities that required only occasionally climbing ramps, stairs, ladders, ropes, or scaffolds and never required stooping, kneeling, crouching, crawling, or balancing. Dr. Guberman concluded that Claimant had significant manipulative limitations in handling, fingering, feeling, and reaching all directions due to Claimant's carpal tunnel syndrome. Claimant's environmental limitations required him to avoid even moderate exposure to extreme cold, extreme heat, wetness, and humidity. Further, Dr. Guberman found that Claimant should avoid all exposure to vibrations and hazards, such as machinery and heights.

**B.    Agency Records**

1.    *Physical Health*

On October 28, 2009, Kip Beard, MD, completed an Internal Medicine Examination at the request of the West Virginia Disability Determination Service. (Tr. at 271–76). Claimant's chief complaints to Dr. Beard were chronic back and neck pain, carpal tunnel syndrome, and surgery on his left ankle. Dr. Beard thoroughly reviewed Claimant's medical history documenting Claimant's list of prescriptions as Lortab, Flexeril, Diclofenac, Xanax, and Celebrex. Dr. Beard subsequently performed a physical examination of Claimant and recorded that Claimant ambulated with a

normal-appearing gait, did not require ambulatory aids, and could stand unassisted. Claimant appeared comfortable while seated and "mildly uncomfortable" while supine. Claimant was able to follow instructions without any noted problems. An examination of Claimant's cervical spine elicited complaints of moderate discomfort during motion testing. Claimant expressed similar discomfort in his arms during motion testing. His elbows showed no signs of pain or tenderness. An examination of Claimant's hands revealed no tenderness or atrophy. Claimant was able to make a fist bilaterally and could write and pick up a coin. Dr. Beard noted that Claimant moved his hands slowly, but range of motion evaluations revealed no limitations. (*Id.*). An examination of Claimant's knees produced no tenderness and revealed an unlimited range of motion. Claimant reported pain in his left ankle during motion testing. Otherwise, Claimant's ankles were found to be normal. An examination of Claimant lumbosacral spine and hips caused pain during motion testing. Dr. Beard noted no tenderness or spasms and found Claimant's curvature to be normal. Claimant's flexion was to 75 degrees with an otherwise normal range of motion and he was able to stand on one leg alone. No signs of pain or tenderness were noted with Claimant's hips, which exhibited a normal range of motion. (*Id.*). Dr. Beard's neurological evaluation revealed giveaway or collapsing weakness in Claimant's left ankle. Dr. Beard also found that Claimant's grip strength was more related to pain than weakness, noting that there was no intrinsic hand atrophy or sensory loss. Dr. Beard felt that Claimant's effort on manual muscle testing and range of motion testing was submaximal. Claimant was able to heel-walk and toe-walk with left ankle pain. X-rays of Claimant's cervical and lumbar spine indicated forward displacement of C5 on C4 with narrowing of C4-C5. (Tr. at 277). Otherwise Claimant's cervical spine exhibited

12

no significant abnormalities. With respect to Claimant's lumbar spine, x-rays reflected normal alignment with well-maintained interspaces and no evidence of scoliotic deformity.   Based on his review of the medical records and physical examination, Dr. Beard diagnosed Claimant with chronic cervicothoracic strain with possible degenerative disk disease, bilateral carpal tunnel syndrome, historical left ankle fracture, and obesity.

On November 11, 2009, Thomas Lauderman, DO, completed a physical residual functional capacity assessment at the request of the SSA. (Tr. at 278–85). Dr. Lauderman found that Claimant could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk about six hours a day, sit for six hours a day, and was unlimited in his ability to push or pull. (Tr. at 279). Claimant's postural limitations restricted him to activities that required only occasionally climbing ramps, stairs, ladders, ropes, or scaffolds; stooping; kneeling; crouching; and crawling, and never required balancing. (Tr. at 280).  Dr. Lauderman found that Claimant was not subject to any manipulative, visual, or communicative limitations. (Tr. at 281–82). Claimant's environmental limitations required him to avoid concentrated exposure to extreme cold, extreme heat, and vibration, and to avoid all exposure to hazards, such as machinery and heights. (Tr. at 282). On a daily basis, Claimant reported difficulty with fastening buttons, tying his shoes, performing personal hygiene, lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, and using his hands. (Tr. at 283). Claimant stated that he was able to prepare meals, wash clothes, and sweep the sidewalk. (*Id.*). Dr. Lauderman noted that Claimant had no problem picking up coins or fastening buttons in a previous examination and found Claimant to be only partially credible. (*Id.*).

On March 8, 2010, Fulvio Franyutti, MD, completed a second physical residual functional capacity assessment. (Tr. at 346–61). Dr. Franyutti found that Claimant could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk about six hours a day, sit for six hours a day, and was unlimited in his ability to push or pull. (Tr. at 347). Claimant's postural limitations restricted him to activities that required only occasionally climbing ramps, stairs, ladders, ropes, or scaffolds; stooping; kneeling; crouching; and crawling, and never required balancing. (Tr. at 348). Dr. Franyutti found that Claimant was not subject to any manipulative, visual, or communicative limitations. (Tr. at 349–50). Claimant's environmental limitations required him to avoid concentrated exposure to extreme cold, extreme heat, and vibration, and to avoid even moderate exposure to hazards, such as machinery and heights. (Tr. at 350).

2.  *Mental Health*

On February 24, 2010, Penny Purdue, MA, completed a mental status examination of Claimant. (Tr. at 315–17). Claimant was driven to the appointment by a friend and appeared wearing hand braces. (Tr. at 315). Ms. Perdue noted that Claimant's posture and gait were unremarkable. Claimant stated that he was applying for benefits because of carpal tunnel syndrome; neck, back, and ankle pain; and depression with other mental health issues. Claimant informed Ms. Perdue that he had last worked three to four years earlier. Ms. Perdue noted that Claimant began to experience symptoms of depression in 2007, which were exacerbated by the death of his girlfriend in September 2009. Claimant described his symptoms of depression as including a loss of interest and motivation, societal withdrawal, difficulty sleeping, a loss of energy, feelings of worthlessness, recurrent thoughts of death, and poor

concentration. Claimant had no history of mental health treatment or counseling.

Ms. Perdue found that Claimant's speech, mood, affect, thought process, thought content, perception, judgment, immediate memory, remote memory, concentration, and psychomotor activity were all within normal limits. (Tr. at 316–17). Claimant's recent memory was found to be markedly deficient. (Tr. at 316). Ms. Perdue diagnosed Claimant with a Major Depressive Disorder, single episode, partial remission. (Tr. at 317). Claimant described his daily activities, reporting that he could perform household chores and personal care, cook, drive, handle his finances, visit his son, and watch television. When Claimant experienced increased pain or anxiety, he stated that he would stay in and watch television. Claimant stated that he was forgetful and often left pans on the stove. Claimant's daughter assisted him with domestic tasks. Claimant did not like to go shopping by himself because of his "nerves." Claimant explained that he no longer hunted or fished because of his physical problems and lack of interest. Ms. Perdue noted that Claimant reported no social activities, but used to go out with friends to shoot pool and play darts. Ms. Perdue found that Claimant's social functioning, pace, and persistence were within normal limits and that he was competent to manage any benefits he was awarded.

On March 1, 2010, Joseph Kuzniar, Ed.D, completed a psychiatric review technique using Ms. Perdue's findings. (Tr. at 318–31). Dr. Kuzniar concluded that Claimant's mental impairments were not severe although he did suffer from major depressive disorder. (Tr. at 318-21). Dr. Kuzniar noted that Claimant wore hand braces to his appointment and had expressed concern over his ability to support himself. Next, Dr. Kuzniar evaluated the Paragraph B criteria regarding Claimant's functional limitations. (Tr. at 328). Dr. Kuzniar found that Claimant had no

functional limitations with respect to his activities of daily living or his ability to maintain concentration, persistence, and pace but did exhibit signs of mild difficulty in maintaining social functioning. Nevertheless, Claimant had no episodes of decompensation. Dr. Kuzniar then evaluated the Paragraph C criteria and found that the medical evidence did not establish the presence of the C criteria. (Tr. at 329). Dr. Kuzniar recorded Claimant's activities of daily living, commenting that Claimant could watch television, drive a car, run errands, manage his finances, perform light household chores, perform personal care with some difficulty, and care for his pet with the assistance of others. (Tr. at 330). Based on Claimant's description of his activities of daily living and the medical record, Dr. Kuzniar found that Claimant's credibility was "acceptable."[4]

**IV.** __Summary of ALJ's Decision__

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are

---

[4] The medical record includes a second psychiatric review technique completed by Dr. Kuzniar on March 1, 2010 for Claimant's DIB claim. (Tr. at 332–45). Dr. Kuzniar found that there was insufficient evidence to complete a medical evaluation of Claimant's mental impairments prior to his date last insured. (Tr. at 332, 344).

denied. 20 C.F.R. §§ 404.1520, 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers

17

in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2007. (Tr. at 12, Finding No 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since July 1, 2007, the time of the alleged onset of disability. (*Id.*, Finding No. 2). Turning to the second step of the evaluation, the ALJ determined that Claimant had the following severe impairments: bilateral carpal tunnel syndrome, arthritis of the lumbar and cervical spines, status post-open reduction internal fixation of the left ankle, obesity, and depression. (Tr. at 13, Finding No. 3). Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (*Id.*, Finding No. 4). Accordingly, the ALJ assessed Claimant's RFC, finding that Claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with numerous non-exertional limitations, detailed as follows: Claimant could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl; could never climb ladders, ropes, or scaffolds; should avoid concentrated exposure to extreme heat, extreme cold, and vibration; should avoid even moderate exposure to hazards such as heights and moving machinery; could occasionally push and pull with his left upper extremity; could not work at a fixed production rate pace; and could perform simple tasks consistent with the SVP 2 entry level work, as defined by the Dictionary of Occupational Titles (DOT). (Tr. at 15, Finding No. 5).

The ALJ analyzed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 20–22, Finding Nos. 6–10). The ALJ considered that (1) Claimant was unable to perform any past relevant work; (2) he was born in April 1956 and was defined as an individual closely approaching advanced age at the time of the amended disability onset date; (3) he had a high school education and could communicate in English; and (4) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled." (Tr. at 20, Finding Nos. 6–9). The ALJ then considered all of these factors and, relying upon the testimony of a vocational expert, determined that Claimant could perform specific jobs at the light and sedentary exertional levels. (Tr. at 21, Finding No. 10). At the light exertional level of jobs, the ALJ found that Claimant could work as machine tender and general production inspector. (Tr. at 21). At the sedentary level, the ALJ found that Claimant could work as a grader/sorter, security monitor, or order clerk. (*Id.*) Therefore, the ALJ concluded that Claimant was not disabled and, thus, was not entitled to benefits. (Tr. at 22, Finding No. 11).

## V.    Claimant's Challenges to the Commissioner's Decision

Claimant contends that the Commissioner's decision is not supported by substantial evidence because: (1) the ALJ failed to develop the record regarding Claimant's chronic pain, anxiety, and depression and (2) the ALJ failed to consider Claimant's physical impairments in combination. (Pl.'s Br. at 10–13).

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial

evidence. In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision." *Blalock,* 483 F.2d at 775. A careful review of the record reveals that the decision of the Commissioner is based upon an accurate application of the law and is supported by substantial evidence.

**VII.** <u>**Analysis**</u>

**A.     Duty to Develop the Record**

First, Claimant argues that the ALJ failed to fully develop the record regarding his chronic pain, anxiety, and depression. According to Claimant, the ALJ asked only non-specific, open-ended questions at the administrative hearing and ignored records corroborating the disabling effects of Claimant's chronic pain and emotional

distress. In response, the Commissioner contends that the record contains sufficient objective evidence upon which to assess Claimant's applications. Moreover, the ALJ performed an adequate inquiry into Claimant's subjective symptoms at the administrative hearing. The Commissioner emphasizes that Claimant's counsel had an affirmative duty to submit all of the relevant evidence supporting his client's claim of disability; the ALJ did not have the burden to establish non-disability.

The record confirms that Claimant produced sufficient medical documentation to verify his alleged impairments and fully illustrate his complaints of pain by anatomical location, persistence, and severity. At the outset of the administrative hearing, the ALJ offered Claimant's attorney an opportunity to supplement the record, which he declined, averring that the record was complete. In fact, the record appears complete, without any noticeable gaps in Claimant's treatment history. Following her initial query regarding the comprehensiveness of the medical documentation, the ALJ questioned Claimant at length regarding his physical impairments, his exertional and nonexertional limitations, his work history, and his daily activities. (Tr. at 29–38, 42). Claimant's attorney also questioned Claimant, further developing his testimony regarding his physical and mental impairments, including his pain symptoms, anxiety, and depression. (Tr. at 39–42).

An ALJ has the duty to fully and fairly develop the record, but is not required to act as Claimant's counsel. *Clark v. Shalala,* 28 F.3d 828 (8th Cir. 1994); *see also Reed v. Massanari*, 270 F.3d 838 (9th Cir. 2001); *Haley v. Massanari*, 258 F.3d 742 (8th Cir. 2001); *Smith v. Apfel*, 231 F.3d 433 (7th Cir. 2000). To the contrary, an ALJ has the right to presume that Claimant's counsel provided the key medical documentation and presented Claimant's strongest case for benefits. *Nichols v.*

*Astrue,* 2009 WL 2512417, at *4 (7th Cir. 2009) (citing *Glenn v. Sec'y of Health and Human Servs.,* 814 F.2d 387, 391 (7th Cir. 1987)). "An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001). Ultimately, "[a]lthough the ALJ has the duty to develop the record, such a duty does not permit a claimant, through counsel, to rest on the record ... and later fault the ALJ for not performing a more exhaustive investigation." *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008); *see also* Social Security Act, § 223(d)(5)(B), 42 U.S.C.A. § 423(d)(5)(B); 20 C.F.R. § 404.1512(d). When considering the adequacy of the record, the undersigned must look for evidentiary gaps that result in "unfairness or clear prejudice" to the claimant. *Brown v. Shalala,* 44 F.3d 931, 935 (11th Cir. 1995). A remand is not warranted every time a claimant alleges that the ALJ failed to fully develop the record. *Brown*, 44 F.3d at 935 (finding that remand is appropriate when the absence of available documentation creates the likelihood of unfair prejudice to the claimant.). The decision of an ALJ will not be overturned for failure to fully and fairly develop the record "unless the claimant shows that he or she was prejudiced by the ALJ's failure. To establish prejudice, a claimant must demonstrate that he or she could and would have adduced evidence that might have altered the result." *See Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000). In the present case, the ALJ had detailed records of examinations, assessments, consultations, agency evaluations, laboratory and radiological studies that spanned the period from August 2002 through July 2010. These records provided substantial evidence of the status of Claimant's medical conditions as they existed during the alleged period of disability. The treatment records from the Scott

22

Orthopedic Center and Merritts Creek Family Medical Center, Dr. Beard's consultative examination report, Ms. Perdue's psychological evaluation, and the RFC assessments all address Claimant's complaints of chronic pain, anxiety, and depression and provide a chronological picture of Claimant's symptoms. This extensive documentation created a more than adequate record upon which the ALJ could evaluate the persistence and severity of Claimant's complaints of chronic pain, anxiety, and depression. In addition, Claimant's testimony during the administrative hearing further developed the record as to Claimant's complaints of chronic pain. (Tr. at 29–42). Claimant supplied ample information regarding the pain that resulted from certain physical activities, his use of pain medications, and his regimen of injections, which the ALJ thoroughly reviewed in her written opinion. Consequently, the undersigned **FINDS** that the record before the ALJ was adequately developed and further **FINDS** no evidence of gaps in the record upon which to conclude that Claimant suffered any conceivable prejudice.

### B.   Impairments in Combination

Claimant argues that even a cursory review of the medical documentation substantiates that his impairments, when considered in combination, "equal, as a whole, the listing for disability." (ECF No. 10 at 12). Nonetheless, Claimant fails to explicitly identify which listed impairment is met or equaled by his combination of impairments.

A determination of disability may be made at step three of the sequential evaluation when a claimant's impairments meet or medically equal an impairment included in the Listing. The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a

23

person from doing any gainful activity." *See* 20 C.F.R. §§ 404.1525, 416.925 Because the Listing is designed to identify those individuals whose medical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA has intentionally set the medical criteria defining the listed impairments at a higher level of severity than that required to meet the statutory standard of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532 (1990). "For a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Sullivan*, 493 U.S. at 530. If the claimant is unable to demonstrate that his impairments, alone or in combination, match the criteria of a particular listed impairment, the claimant may still establish disability by showing that his impairments are medically equivalent to the listed impairment.

To establish medical equivalency, a claimant must present evidence that his impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a specific listed impairment. *Id.* at 520; *See also* 20 C.F.R. §§ 404.1526, 416.926. In Title 20 C.F.R. §§ 404.1526, 416.926, the SSA sets out three ways in which medical equivalency can be determined. First, if the claimant has an impairment that is described in the Listing, but (1) does not exhibit all of the findings specified in the listing, or (2) exhibits all of the findings, but does not meet the severity level outlined for each and every finding, equivalency can be established if the claimant has other findings related to the impairment that are at least of equal medical significance to the required criteria. §§ 404.1526(b)(1), 416.926(b)(1). Second, if the claimant's impairment is not described in the Listing, equivalency can be established by showing that the findings related to the claimant's impairment are at least of equal medical significance to those of a similar listed

impairment. §§ 404.1526(b)(2), 416.926(b)(2). Finally, if the claimant has a combination of impairments, no one of which meets a listing, equivalency can be proven by comparing the claimant's findings to the most closely analogous listings; if the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will be considered equivalent to the most similar listing. §§ 404.1526(b)(3), 416.926(b)(3). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment . . . A claimant cannot qualify for benefits under the 'equivalency' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan*, 493 U.S. at 531.

Here, the ALJ determined that Claimant had the following severe impairments: bilateral carpal tunnel syndrome, arthritis of the lumbar and cervical spines, status post-open reduction internal fixation of the left ankle, obesity, and depression. (Tr. at 13). Given the nature of Claimant's severe impairments, the ALJ logically compared Claimant's medical findings to the criteria of the listed impairments contained in Section 1.00 of the Listing (musculoskeletal system), Section 11.00 (neurological system) and Section 12.00 (mental impairments). (Tr. at 13-15). The ALJ explicitly selected the various listed impairments within these three sections that most closely aligned with Claimant's impairments and thoroughly explained why Claimant's findings were not equivalent to the criteria of each selected impairment. The ALJ found that Claimant's fractures had healed solidly; he could ambulate effectively; and showed no neurological deficits sufficient to meet a listed

25

impairment within the section on the musculoskeletal system. Similarly, Claimant did not demonstrate disorganization of motor function necessary to satisfy an impairment of the neurological system. Claimant lacked the degree of functional restriction necessary to satisfy the requisite Paragraph B criteria to equal a psychiatric listing and had no evidence of Paragraph C criteria. Finally, the ALJ considered the impact of Claimant's obesity "and the combined effect of his impairments," concluding that "the evidence does not establish presumptive disability." (Id.).

The ALJ's conclusion that Claimant did not equal a listed impairment of the musculoskeletal system is supported by substantial evidence. The medical record indicates that Claimant was treated for chronic back pain. During the course of his treatment, no physician ever diagnosed Claimant with a neurological disorder of the spine or its equivalent. Claimant was consistently diagnosed as suffering from arthritis of the lumbar and cervical spines. However, no treating source or state agency physician found any evidence of nerve root compression, arachnoidistis, or stenosis. No physician ever recommended that Claimant have surgery on his back. In addition, the ALJ found that Claimant's fractured left lateral malleolus had a solid union on medically acceptable imaging and that Claimant was able to ambulate effectively. (Tr. at 13). In addition, Claimant continued to work in the years following his ankle surgery.

Substantial evidence also supports the ALJ's finding that Claimant's impairments did not equal in severity any listed neurological impairment. No examining physician during the relevant time period found that Claimant exhibited signs of persistent disorganization of motor function in the form of paresis or

26

paralysis, tremor or other involuntary movements, ataxia and sensory disturbances. Although Claimant suffered from carpal tunnel syndrome, no examining physician or state agency expert found that this significantly interfered with Claimant's use of his fingers, hands and arms or prevented him from engaging in substantial gainful activity. Likewise, although Claimant had surgery on his left ankle and suffered from arthritis of the lumbar and cervical spines, no examining physician found that these impairments in combination significantly inhibited Claimant's locomotion or his ability to engage in substantial gainful activity.

Lastly, the ALJ correctly found that Claimant's mental health treatment records did not contain findings of the severity needed to establish a presumptive psychiatric disability. Two state agency experts completed evaluations of Claimant's mental impairments. (Tr. at 315–17, 318–31). Ms. Perdue noted that Claimant had no history of mental health treatment or counseling. (Tr. at 315). Claimant received limited treatment for his depression and his treating physician prescribed Xanax and Trazodone to alleviate his symptoms. Ms. Perdue found that Claimant's speech, mood, affect, thought process, thought content, perception, judgment, immediate memory, remote memory, concentration, and psychomotor activity were all within normal limits. (Tr. at 316–17). Similarly, Dr. Kuzniar concluded that Claimant's mental impairments were not severe. (Tr. at 318). Dr. Kuzniar found that Claimant had no functional limitations with respect to his activities of daily living or his ability to maintain concentration, persistence, and pace. Claimant did exhibit signs of mild difficulty in maintaining social functioning. Further, Dr. Kuzniar noted that Claimant had no episodes of decompensation. Dr. Kuzniar found no medical evidence to support the presence of the C criteria. (Tr. at 329).

Assuming that Claimant's contention is not that his impairments are medically equivalent to a listed impairment, but that the overall functional consequence of his combined impairments meets the statutory definition of disability, the analysis shifts from the Listing to the ALJ's RFC findings and the remaining steps of the sequential evaluation. As the Fourth Circuit Court of Appeals stated in *Walker v. Bowen,* "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." 889 F.2d 47, 50 (4th Cir. 1989). The social security regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. § 404.1523.

Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir. 1985). The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

Here, the ALJ took into account the exertional and non-exertional limitations

that resulted from Claimant's medically determinable impairments in determining Claimant's RFC. The ALJ restricted Claimant to light work and provided numerous environmental and postural limitations. (Tr. at 15). In assessing Claimant's residual functional capacity, the ALJ provided a thorough review of the objective medical evidence, the subjective statements of Claimant, and the opinion evidence. (Tr. at 15–20). At the outset, the ALJ explicitly stated that she considered all of Claimant's medically determinable impairments in combination. (Tr. at 14). The ALJ reviewed the Claimant's testimony regarding his daily activities and his mental and physical impairments. (Tr. at 16). Claimant reported pain and numbness in his hands, which made it difficult to lift or carry objects because of his poor grip strength. According to Claimant, his medications helped with his pain, but he experienced ankle, back, and neck pain when standing or sitting for extended periods of time. Claimant also described his symptoms of depression and anxiety and their effects on his activities of daily living. The ALJ properly compared Claimant's testimony to the medical record, performing the two-step credibility analysis required by the social security regulations. (Tr. at 16–20). The ALJ recognized that Claimant had a history of hand pain, carpal tunnel syndrome, and epicondylitis of the left elbow. (Tr. at 16). However, the ALJ concluded that Claimant's allegations of pain and functional limitation were exaggerated. She noted that x-rays of Claimant's left arm were essentially normal and a clinical exam revealed no significant abnormalities. Further, Claimant discontinued treatment for carpal tunnel syndrome in early 2009 and had performed work remodeling and installing dry wall as recently as January 2009.

The ALJ then considered Claimant's back and neck pain. (Tr. at 17). Claimant had been diagnosed with lumbar strain and general arthralgia of the spine, but the

medical evidence indicated that Claimant's pain was adequately controlled by medication. The ALJ noted that Dr. Beard's examination and x-rays of Claimant's spine revealed minimal degenerative changes. Next, the ALJ reviewed Claimant's medical history regarding his left ankle fracture. The ALJ acknowledged that Claimant underwent open reduction internal fixation surgery on his left ankle, but emphasized that the fracture healed after surgery and that Claimant had not received treatment on his left ankle since 2003. Further, Dr. Beard's examination revealed no objective weakness or atrophy in the left ankle and a normal range of motion.

Finally, the ALJ discussed Claimant's treatment for depression and anxiety. (Tr. at 18). Medical records indicated that Claimant had begun to experience symptoms of depression and anxiety following his girlfriend's death in November 2009. Claimant's treating physician observed that Claimant was depressed and prescribed him with Xanax and Trazodone. After reviewing this evidence, the ALJ observed that Claimant had not received counseling for his depression and his symptoms had been controlled by anti-depressants and anti-anxiety medication. Based on the objective medical evidence and the findings of the state agency psychologists, the ALJ concluded that Claimant suffered from situational depression that was well-controlled with medication.

Claimant additionally challenges the ALJ's consideration of Dr. Guberman's opinion letter, Ms. Perdue's mental status examination, and the treatment records from Scott Orthopedic. Claimant contends that the ALJ failed to give them sufficient weight. A review of the ALJ's written opinion demonstrates that Claimant's argument is misguided. The ALJ considered and discussed each of these sources' records. To the extent that the ALJ discounted the weight of any of these records, she explained

30

her reasons for doing so. First, the ALJ explicitly addressed Dr. Guberman's opinions in her written opinion. (Tr. at 19). The ALJ recounted Dr. Guberman's findings regarding Claimant's functional limitations, but stressed that she afforded Dr. Guberman's opinion little weight because Dr. Guberman did not examine Claimant and his findings were not corroborated by Claimant's treatment records or the report of Dr. Beard, the consultative examiner. Although Claimant may disagree with the ALJ's decision to assign Dr. Guberman's opinion limited evidentiary weight, Claimant cannot plausibly argue that the ALJ failed to consider Dr. Guberman's opinion.

Second, the ALJ explicitly discussed Ms. Perdue's findings regarding Claimant's functional limitations throughout her opinion. Based partially on Ms. Perdue's findings, the ALJ found that Claimant's depression was a severe impairment. (Tr. at 13). In determining whether Claimant's depression and anxiety satisfied a listed impairment, the ALJ noted Ms. Perdue's finding that Claimant's ability to concentrate was limited. (Tr. at 14). Based on Ms. Perdue's finding and the objective medical evidence, the ALJ credited Claimant with having moderate difficulties with respect to concentration, persistence, and pace. The ALJ again explicitly discussed Ms. Perdue's finding in evaluating Claimant's residual functional capacity. (Tr. at 18, 19, 20).

Finally, Claimant's argument concerning the ALJ's consideration of Claimant's treatment records from Scott Orthopedic Center is perplexing. Claimant's amended disability onset date in this case is July 1, 2007. (Tr. at 12, 27–28). The medical record indicates that Claimant was last treated at Scott Orthopedic Center on February 6, 2006, over a year before the alleged onset of disability.  Claimant continued to work during his treatment at Scott Orthopedic Center, generally

31

receiving permission to return to work from the treating orthopedists at the Center. (Tr. at 221–24). Accordingly, the records from Scott Orthopedic provide nothing more than information on Claimant's medical history. The ALJ appropriately used these records as background data to provide context to her analysis, but focused the majority of her opinion on a consideration of treatment records from the relevant time period.

Nonetheless, in determining the severity of Claimant's carpal tunnel syndrome and left ankle fracture, the ALJ explicitly discussed treatment records from Scott Orthopedic. (Tr. at  13). The ALJ also considered treatment records from Scott Orthopedic in determining whether Claimant's left ankle fracture satisfied the criteria for Listing 1.06. (*Id.*). When determining Claimant's residual functional capacity, the ALJ also discussed Claimant's treatment records from Scott Orthopedic concerning his hand pain, carpal tunnel syndrome, epicondylitis of the left elbow, and left ankle fracture. (Tr. at 16, 17). Far from ignoring these records, the ALJ reasonably considered and evaluated them in light of the evidentiary record as a whole.

The ALJ's conclusion that Claimant's combination of impairments was not so severe as to preclude Claimant from engaging in substantial gainful activity is amply supported by the medical record. Claimant's daily activities included performing household chores and personal care, cooking, driving, managing his finances, visiting his son, and watching television. (Tr. at 317). Significantly, Dr. Marcuzzi's treatment notes indicate that Claimant was working on projects remodeling homes and hanging drywall as late as January 1, 2009, more than a year after Claimant's alleged disability onset date. (Tr. at 256) Other than Dr. Guberman, no physician or therapist found that Claimant's impairments separately or in combination prevented him from

32

engaging in substantial gainful activity. In both RFC assessments, the reviewing physicians found that Claimant could engage in "light" exertional work with a number of postural and environmental limitations. (Tr. at 278–85, 346–61). Moreover, at the administrative hearing, the ALJ presented the vocational expert with a hypothetical question that required the expert to take into account Claimant's impairments in combination. She asked the expert to assume that Claimant had the exertional limitations identified in her RFC assessment, as well as additional postural and environmental limitations. Despite being asked to assume all of these restrictions, the vocational expert opined that Claimant could perform certain jobs that existed in significant numbers in the economy. (Tr. at 45–46). In light of this substantial evidence, the undersigned **FINDS** that the ALJ adequately considered and accounted for the overall functional impact of Claimant's combined impairments.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **GRANT** Defendant's Motion for Judgment on the Pleadings (ECF No. 11), **DENY** Plaintiff's Motion for Judgment on the Pleadings (ECF No. 10), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, Plaintiff shall have fourteen days (filing of objections) and three days

(mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**ENTERED**: May 14, 2012.

Cheryl A. Eifert
United States Magistrate Judge